HIS MAJESTY, KING OF THE UNITED KINGDOM OF GREAT BRITAIN AND IRELAND AND OF THE BRITISH DOMINIONS BEYOND THE SEAS, EMPEROR OF INDIA, Plaintiff, *v.* MANNING, MAXWELL & MOORE, Defendant.

Supreme Court, New York Special Term, June, 1923.

**Accounting — contract for the manufacture of rifles — charge of fraud not sustained — agency disproved.**

The Remington Arms Company, formed in April, 1915, for the purpose of providing extra facilities for the manufacture of rifles for the British government, in order to carry out a contract to manufacture for said government a large number of Enfield rifles, began the construction and equipment of a plant at Eddystone, Penn. The complaint in an action brought by the British government alleged that the Remington Company employed the defendant as its agent to purchase the machinery, materials and equipment of the new plant for a compensation of five per cent of the actual cost of the same; that as such agent defendant made large and numerous purchases and knowingly rendered false and fraudulent statements showing the costs to be greatly in excess of what they were; that the Remington Company, relying upon said statements in the belief that they were true, paid to the defendant certain sums of money. The complaint sets forth the assignment by the Remington Company to plaintiff of all sums of money due to said company from the defendant, and the relief asked was that all of the accounts and statements rendered by defendant to plaintiff's assignor be adjudged fraudulent and void and that defendant be required to account, and that plaintiff have a decree against defendant for the amount of defendant's charges for purchases above the actual cost of said purchases to defendant plus five per cent compensation based upon said actual cost to the defendant. The answer was a general denial. *Held*, that both the documentary evidence and the oral testimony failed to support the charge of fraud against the defendant; that the claim of plaintiff that defendant acted as agent of the Remington Company on a commission basis was satisfactorily disproved by the testimony concerning an interview on April 9, 1915, between the manager of the Remington Company, its expert, and the vice-president of defendant, together with a confirmatory letter sent by defendant's vice-president to the Remington Company the day following said interview, and by the manner of carrying out the numerous transactions between the parties. Judgment directed in favor of the defendant.

ACTION for an accounting.

*White & Case (Joseph M. Hartfield, Robert Forsyth Lyttle and James Adam Murphy, of counsel), for plaintiff.*

*Sullivan & Cromwell (Joseph M. Proskauer, of counsel), for defendant.*

DAVIS, J. This action is brought by plaintiff as assignee of a claim existing in favor of the Remington Arms Company against the defendant, Manning, Maxwell & Moore, for an accounting.

It appears that the Remington Arms Company in April, 1915, was under contract to manufacture for the British government a large number of Enfield rifles. To carry out this contract the Remington Company began the construction and equipment of a plant at Eddystone, Penn. It is alleged in the complaint that in 1915 the Remington Company employed the defendant as its agent to purchase the machinery, materials and equipment for the new plant for a compensation of five per cent of the actual cost of the same; that as agent the defendant made large and numerous purchases and knowingly rendered false and fraudulent statements showing the costs to be greatly in excess of what they were; that the Remington Company, relying upon the statements in the belief that they were true, paid to the defendant the sums mentioned therein. The complaint sets forth the assignment to the plaintiff by the trustees of the Remington Arms Company of all sums of money due from defendant to the Remington Arms Company. Plaintiff prays that all of the accounts and statements rendered by defendant be adjudged fraudulent and void and that defendant be required to account, and that the plaintiff have a decree against defendant for the amount of the defendant's charges for purchases above the actual cost of said purchases to defendant plus five per cent compensation based upon said actual cost to defendant. The answer of defendant is a general denial. The Remington Arms Company was formed April 14, 1915, for the purpose of providing extra facilities for the manufacture of rifles for the British government. Two contracts were entered into between the British government and the Remington Arms Company, one on April 30, 1915, for the purchase by the British government from the Remington Arms Company of 1,500,000 Enfield rifles, and the second on August 2, 1915, for the purchase and sale of 500,000 Enfield rifles, all at a cost of about $60,000,000. Under these conditions the Remington Company had to provide an equipment for a new plant at Eddystone for the manufacture of 5,000 rifles a day to carry out the contract to furnish the 1,500,000 rifles. At this juncture the Remington Company made an agreement with defendant by which, plaintiff claims, the defendant became the agent of Remington to purchase all of the machinery and equipment of the new Eddystone plant for a compensation of five per cent above actual cost. On the other hand, the defendant asserts that the agreement in question was not one of agency, but that it sold the material to the Remington Company and was entitled to any profit it made on the sale. Whether the relation between the parties was one of agency or of buyer and seller will depend mainly upon the effect to be given to the testimony relating

Supreme Court, June, 1923. [Vol. 121

to the interview of April 9, 1915, at which were present Mr. Pryor, manager of the Remington Company, General Thompson, its expert, and Mr. Brotherhood, defendant's vice-president. The agreement, whatever it was, was consummated at that interview. . Interpreting the testimony of Pryor, Brotherhood and Thompson in connection with a confirmatory letter (Exhibit K) sent by Brotherhood to the Remington Company the day following the interview it seems clear that the relation established was that. of buyer and seller. Exhibit K is as follows:

"MACHINERY DEPARTMENT.

"MANNING, MAXWELL & MOORE, INCORPORATED,

"Percy M. Brotherhood, Manager.    119 West 40th Street.
"NEW YORK, *April* 10, 1915.

"Mr. S. F. PRYOR,

  "V.-P., Remington Arms & The U. M. C. Co.,
"299 Broadway, New York:

"DEAR SIR.— We desire to thank you for the order just placed with us for the entire equipment necessary to produce 5,000 rifles per day of 20 hours, and to assure you that we appreciate the confidence placed in us, and further assure you that we will have the necessary equipment ready within the time promised. As per conversation over the phone to-day, we have already placed orders for a large quantity of material which we are absolutely sure will be required, and in placing these orders have arranged with the factories to accept no other orders until we can actually and definitely advise them of the additional machines that will be necessary to have. In order to assist us, we will appreciate very much receiving a drawing and sample gunstock of the English rifle, as it is the woodworking machinery end that we shall have to crowd the hardest. Therefore, we do not want to lose a single day, if we can help it. When will you have a building ready to take in the material and where will this building be located? We have already started on rifling machines, drilling, reaming and chambering machines, barrel turning lathes, profilers, hand and power milling machines, drop hammers and wood equipment. Anything that you can do to give us promptly the exact number of each type of machine required will be appreciated. As promised, I will give the order my personal attention, until everything is completed. As in the case with other orders placed with us, it is understood that the machinery ordered is not subject to cancellation and that the terms of payment will be in accordance with the terms which we now have with you, *i. e.*, net cash in thirty days. In order to meet the deliveries promised it is going to be necessary in order to get the equipment that comes through equally balanced

to have several factories work nights.    Our understanding is that everything is to be crowded along for delivery at the earliest possible moment.

" Again assuring you of our very best efforts, we are respectfully yours,          " Manning, Maxwell & Moore, Inc.,

" Percy M. Brotherhood,

" *Vice-President.*"

At the time they entered into this agreement the defendants were machinery jobbers and with many of the manufacturers they had exclusive selling privileges which enabled them to buy from ten per cent to twelve per cent below the manufacturer's list price, and they practically controlled a very large part of the kind of material to be supplied to the Remington Company.    They depended for their profit upon the discounts from the list price of the manufacturer from whom they bought.    This action is brought in effect to compel the defendant to account for the discounts it received from the manufacturers.    When the parties had completed their agreement the Remington Company gave the defendant a list of the material it needed for the equipment of its new plant.    This list formed the basis of the exhibit known in this case as the Black Book, which was made up by defendant and contained the amount of each material ordered by the Remington Company, the name of the manufacturer thereof, the cost to the Remington Company in round numbers, the times and terms of payment and the date of shipment.    All bills and invoices were made up from this Black Book, and in each case the cost to the Remington Company is the round sum set down in the Black Book.    It is claimed by plaintiff that these amounts were represented by defendant to be the actual cost to defendant plus a five per cent commission.    On the face of the figures this appears improbable, as they are invariably in round sums, and even if the representation had been made, as claimed, it seems strange that the Remington people did not detect and protest against the alleged cheating.    My conclusion is that it was well understood by both parties that the prices marked in the Black Book were the manufacturers' list price and that the defendant was to receive for its profit the various discounts from the list price and not five per cent commission, as claimed by plaintiff. Moreover, the method of carrying out each transaction indicates that the Remington Company was a buyer from defendant.    The invoices and bills used were similar in form and matter to those that had been used and were then being used by the parties in the cases of defendant's supply of material to other similar plants controlled by the Remington Company.    As already stated, the Black

Book contained the list of equipment required by the Remington Company at Eddystone, together with dates of delivery and the prices in round numbers and the name of the manufacturer. These entries in the Black Book became the basis for the formal orders of purchase, as shown by order No. 153 on page 7 of the Black Book. This order is addressed to Manning, Maxwell & Moore and contains the name of material bought, the terms of payments and shipping directions, and under conditions indorsed on the order the defendant became the guarantor of the workmanship and quality of the materials, with the right to the Remington Company to inspect before acceptance. The above is only one instance, but it is typical of the many others, with but few exceptions. I have been unable to find the invoice corresponding to order No. 153, but if we take any other invoice it will serve as well, because all the invoices were uniform. See invoice Exhibit I, in yellow folder. These invoices invariably were sent in the name of Manning, Maxwell & Moore by Manning, Maxwell & Moore, and all payments were made to them. No invoices or bills were received by the Remington Company from the manufacturer. It also appears from the testimony of plaintiff's witness Meyerhoff, who was the Remington Company's general purchasing agent, that this form of purchasing order was identical with those used by him in other transactions with Manning, Maxwell & Moore, which were concededly purchases and sales transactions, notably with the Bridgeport plant. On page 3 of the Black Book is the entry, " H. P. 139 covering 382 Reed Prentice Millers at $650 each, deliveries to be completed by December 1, 1915." It appears that by June twenty-first only ten machines had been delivered. That this was treated by the Remington Company as a default on the part of the defendant as seller is shown by Meyerhoff's statement in his letter of June 21, 1916, to defendant (Exhibit H): " In view of your inability to make delivery in accordance with your contract * * * we beg now to notify you that we cancel the said order of June 4, 1914, and will decline to accept any of the millers called for thereby." As already stated, the Remington Company made no payments to manufacturers, but only to Manning, Maxwell & Moore. At times it was greatly in arrears in its payments — so much so that defendant wrote to the Remington Company asking for money not only for past due amounts for material supplied to the Eddystone plant in question here, but to the Bridgeport plant and for the cartridge plant. It is conceded that the goods supplied to the last two plants were delivered under a purchase and sale agreement with defendant. This letter is Exhibit J, and is addressed to Meyerhoff, the general purchasing agent of the Remington

Arms Company. It reads: " I have just wired down to Eddystone to see if they could not send us some money. They are owing us about $500,000. I find the cartridge plant owes us now about $360,000 and the Bridgeport Arms about $132,000. These are based on bills for which payments are due. You understand, of course, there is a great, deal more material which has been shipped and which bills are not due and for which we have not received remittances. Taking everything into consideration this morning I find the Remington Arms Company are owing us about $1,200,000, so you can see we need money very badly. Anything you can do to help out will be greatly appreciated." It will be observed that this letter places the indebtedness on account of Eddystone in the same category as that of Bridgeport; that is, a buyer's debt to a seller. Viewed in this light the letter in some degree — not slight — supports defendant's contention that defendant occupied the relation of a seller of the material supplied to Eddystone as it did admittedly in the case of Bridgeport. The plaintiff lays stress upon the fact that in the Black Book some of the items are quoted at a sum plus five per cent and argues that these items indicate that the defendant was to receive a commission of five per cent for every item in the original order (Black Book). The defendant claims that these items are only a negligible proportion of the orders. And such appears to be the fact. As shown in Exhibit S the five per cent related to only 390 machines out of a total of about 5,000, and they affect a selling price of $161,000 out of a total of $2,826,000. All of the business done under the original and additional orders amounted to about $3,975,000, and of this sum only about $250,000 thereof was done under the plus five per cent arrangement (Exhibits S and T). As to some of the five per cent items there was an arrangement under which defendant was to be paid five per cent over the purchase price. For instance, in the case of purchases from Brown & Sharpe, it appears that defendant had no commission agreement with Brown & Sharpe, and so the Remington Company bought direct from Brown & Sharpe. On these purchases defendant was paid five per cent commission. Of the $250,000 of five per cent items referred to above about $170,000 went to Brown & Sharpe. Giving fullest consideration to the great amount of documentary evidence relied upon by the plaintiff I am impressed with its weakness as proof and its failure to support the charge of fraud against the defendant. Nor is the oral testimony introduced by plaintiff any more convincing. My conclusion is that the testimony as to the interview of April 9, 1915, between Pryor, Thompson and Brotherhood, together with the confirmatory letter of April 10, 1915, and the

manner of carrying out the numerous transactions between the parties, disproves satisfactorily the claim of the plaintiff that the defendant acted as agent of the Remington Company on a commission basis.   There should be judgment for the defendant.

Judgment accordingly.